IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES                                                               PLAINTIFF

v.                          CASE NO. 5:15-CR-50045

JESSYCA HOSKINS                                                            DEFENDANT

### OPINION AND ORDER

On September 29, 2015, Jessyca Hoskins pled guilty to Count Two of an Indictment (Doc. 13) charging her with distributing child pornography in violation of 18 U.S.C. §§ 2252(a)(2) and (b)(1). On May 23, 2016, the Court sentenced Hoskins to 72 months imprisonment, five years supervised release, a $100 special assessment, and a $2,400 fine. (Doc. 55). At the sentencing hearing, the Court did not determine whether the victim was entitled to restitution, because a week prior it had granted the Government's motion to hold a separate restitution hearing. (Doc. 50). That hearing occurred on August 10, 2016. The Government argued that $10,000 in restitution would be appropriate, and Hoskins took the position that restitution should not be awarded at all. The Court indicated that it would be awarding restitution, but took the matter under advisement to consider the amount. It now finds that the victim is entitled to $7,500 in restitution from Hoskins.

### I.   BACKGROUND

The facts of this case are incredibly upsetting, but a recounting of them is important to appreciating why an award of restitution is appropriate. As set forth in the Final Presentence Investigation Report (Doc. 59), over the weekend of March 20, 2015

1

to March 22, 2015, Jason Henry a/k/a "Allstar" prostituted a 14-year-old female, referred to herein as Jane Doe. Doe was sexually assaulted multiple times over the course of the weekend, while at Henry's direction she performed sexual activity in exchange for money. Henry later told investigators that he was introduced to Doe by Hoskins. On the night of March 21, 2015, Doe was sexually assaulted by an adult male named LaQuentin Jones at Hoskins' apartment. Hoskins filmed a three-minute-long video of the incident and sent the video to a minor child via Facebook.

The following day, Doe sought treatment for her sexual assaults at the Washington Regional Medical Center. The Fayetteville, Arkansas police were notified, and contacted Hoskins at her apartment. Hoskins admitted to knowing that Jones was over the age of 18, that Doe was under the age of 18, and that she filmed and sent the video to the minor child. She was arrested on May 27, 2015, and charged in this Court on June 5, 2015. (Doc. 1). Both Henry and Jones were charged, convicted, and sentenced in state court.

As a result of the aforementioned events, it is undisputed that Doe and her mother have incurred significant costs related to medical and psychological care, and will continue to incur such costs into the future. These costs included Doe's stay at a since-closed inpatient facility in Colorado, separate counseling in Colorado, and local counseling in Arkansas. *See* Doc. 49-2, pp. 4-6. As of May 11, 2016—roughly one year after the incident—Doe's mother estimated $28,700 in expenses, with $10,000 in future projected therapy costs. (Doc. 49-2, p. 1). This estimate included $20,000 in medical and therapy expenses, $2,400 in out-of-state travel expenses, $6,000 in lost wages, and $300 for two cell phones. *Id.* at 7.

Doe's mother has provided documentation to support some of these expenses. An invoice from a counseling service in Fayetteville, Arkansas shows $280.00 due for seven counseling sessions occurring over the span of one month. (Doc. 59-2, p. 2). A ledger from St. Paul's Church in Fayetteville shows that it paid for a total of $11,895 in therapy costs from July to October of 2015. *Id.* at 3. Invoices from the therapy centers support these charges. Doe's Colorado therapist billed St. Paul's for eight therapy sessions over the span of 25 days in September of 2015, for a total of $675. *Id.* at 4. The inpatient center in Colorado charged $2,280 for 19 days in August of 2015, and $3,240 for 27 days in September of that year. *Id.* at 5-6. With respect to future costs, Doe's mother provided a letter from a Trauma and Recovery Specialist in Colorado, which noted:

> In addition to the physical, emotional and psychological wounds left by sex trafficking, the financial cost of treatment is astronomical and often beyond the abilities of victims and their families. The average cost of residential treatment is $2,000.00 per week; outpatient treatment costs an average of $1,000.00 per week. This is an estimated cost of over $100,000.00 per year.

*Id.* at 1.

## II.   LEGAL STANDARD

Restitution in cases involving the sexual exploitation and abuse of children is governed by 18 U.S.C. § 2259. Under § 2259, restitution is mandatory. *See* 18 U.S.C. §§ 2259(a) ("[T]he court *shall* order restitution for any offense under this chapter." (emphasis added)); 2259(b)(4)(A) ("The issuance of a restitution order under this section is mandatory."). The restitution award, moreover, must be in the "full amount of

3

the victim's[1] losses." *Id.* at (b)(1). A victim's losses include costs incurred due to "medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorneys' fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense." *Id.* at (b)(3). Notably, the Court "may not decline to issue" restitution because of "the economic circumstances of the defendant" or "the fact that the victim has, or is entitled to, receive compensation for [her] injuries from the proceeds of insurance or any other source." *Id.* at (4)(B).

Determining the proper amount of a restitution award is more complicated in sexual abuse and exploitation cases involving multiple offenders, some of whom are not defendants before the sentencing court. The prototypical example of this type of case is one in which a defendant possessed a widely circulated video of child pornography. The victim's damages in such cases are caused by potentially thousands of people, including those who produced the video, distributed the video, and possessed the video. The Supreme Court addressed the allocation of restitution in these cases in *Paroline v. United States*, 134 S. Ct. 1710 (2014). It held that restitution is "proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses." *Id.* at 1722. The Court then concluded that a "victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes," and thus a proximate cause thereof. *Id.*

---

[1] When the victim "is under 18 years of age" the term "victim" includes "the legal guardian of the victim." *Id.* at (c).

4

Once proximate cause is established, a court must determine the proper amount of restitution by assessing "as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id.* at 1727-28. "This cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id.* at 1728. While the inquiry evades application of "a precise algorithm," district courts can begin by determining "the amount of the victim's losses caused by the continuing traffic in the victim's images," and then "set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id.*

### III.    DISCUSSION

The instant case is not perfectly analogous to *Paroline* and its progeny, but it is close. Like the typical *Paroline* case, the Court is faced with questions of causation and allocation of responsibility between the defendant and several non-defendants. The Court is also faced with substantial uncertainty regarding the number of future viewers of the child pornography, and the future extent of harm that the victim will suffer. The nature of the harm suffered by Doe is also similar to that of a victim in a typical *Paroline* case. As Doe's mother stated at Hoskins' sentencing hearing, everyone at Doe's school knew about the incident, and knew that there was a video recording of it. Thus, while there is some uncertainty about whether the video was circulated beyond the initial person to whom it was sent,[2] a large number of individuals are aware of the victim's rape, and that it was recorded. The psychological effect on Doe is, no doubt, similar to

---

[2] There is at least some indication that the video was circulated beyond the initial person to whom it was sent. Namely, Doe's mother testified that she heard about some details of the video from people who had seen it.

5

that of victims whose images are widely reproduced. Given these similarities, *Paroline* is highly instructive to the Court's restitution analysis.

### A. Determining Doe's Damages

The first step in the Court's analysis involves estimating Doe's full damages. *Cf. United States v. Evans*, 802 F.3d 942, 949 (8th Cir. 2015) (stating that the victim's "full restitution amount was $1,346,158.12" and then noting that the district court applied the *Paroline* factors to determine the "appropriate amount" of the defendant's liability) (*petition for cert. filed*). As will become apparent, the Court is not estimating the amount of Doe's full damages to use it as part of "a purely mathematical or mechanical exercise." *Id.* at 950 (quoting *Paroline,* 134 S.Ct. at 1728). Rather, the estimated amount is useful to the Court as a "rough guidepost[] for determining an amount that fits the offense." *Id.*

To date, Doe has incurred a total of $11,895 in *documented* losses, evidenced by St. Paul's ledger and the invoices referenced above. Though there is no documented proof to support the other expenses claimed by Doe's mother in her victim impact statement, (Doc. 49-2), it would be naïve to conclude that none were incurred. Specifically:

(i) Doe traveled to and from Colorado in 2015 to obtain psychological care;

(ii) She was seen at Washington Regional Medical Center after her abuse occurred;

(iii) Doe's mother testified that Doe was admitted to a facility due to her suicidal behavior shortly after the incident;

(iv) The Court credits Doe's mother's statement that she has suffered lost wages, though it does not credit her claimed amount of $6,000, for which there is no support; and

6

    (v)    Doe's mother testified that Doe continues to receive therapy.

Despite the lack of documentation to support the specific amounts of these expenses, the Court can still consider them in awarding restitution. In the recent case of *United States v. Emmert*, the Eighth Circuit affirmed a district court's award of restitution in a child pornography case "despite the fact that [the minor] ha[d] not documented each expense." --- F.3d ----, 2016 WL 3343364 at *4 (8th Cir. June 15, 2016). The district court was "entitled to rely on the testimony and a basic knowledge of medical expenses in determining that $500 in restitution was a reasonable and likely understated sum for the type of medical and psychological treatment [the minor] required." *Id.* "[T]he mere absence of evidence detailing the specific nature and timing of medical expenses [was] not sufficient to show an abuse of discretion." *Id.*

Following *Emmert*'s instruction, the Court will credit $3,000 in damages for the above-listed expenses. This amount is undoubtedly a "reasonable and likely understated" estimate. *Id.* Flights from Fayetteville, Arkansas to Denver, Colorado regularly cost north of $300.00 each way. *See* http://www.google.com/flights (search XNA to DEN). Emergency room visits, even for just a few hours, often cost over $1,000. *E.g.*, Lindsay Abrams, *How Much Does It Cost to Go to the ER?*, The Atlantic (Feb. 28, 2013) (available at http://www.theatlantic.com/health/archive/2013/02/how-much-does-it-cost-to-go-to-the-er/273599). Inpatient care at a psychiatric or psychological facility is several hundred dollars, even for a short stay. *E.g.*, Doc. 59-2, pp. 5-6. The cost of therapy, even if just for one session a week at the $40.00 rate charged by Doe's Fayetteville therapist, would be over $1,600 from the time she returned to Arkansas in October of 2015. *Id.* at 2. Further, this latter figure is likely understated significantly,

given that the one record of Doe's counseling in Arkansas shows seven sessions over approximately four weeks. *Id.* That record also includes a handwritten note stating that $1,200 was "currently due" as of May 31, 2016. *Id.* Using these low estimates, the amount of expenses is already over $3,000, without factoring lost wages. This amount, as the Court stated, is intended to be a reasonable but low estimate, due to the lack of documentation of the expenses.

Adding the $3,000 to the $11,895 in documented expenses brings the costs incurred by Doe to $14,895. The Court's inquiry into Doe's damages, however, does not end there. The Court will also consider the medical expenses the victim is likely to incur in the future. "The law is clear that a restitution order entered pursuant to § 2259 may include restitution for estimated future medical expenses." *United States v. Cooley*, 2014 WL 5872720, at *2 (D. Neb. Nov. 12, 2014) (citing *United States v. Pearson*, 570 F.3d 480, 486–87 (2d Cir. 2009); *United States v. Laney*, 189 F.3d 954, 966–67 (9th Cir. 1999); and *United States v. Palmer*, 643 F.3d 1060, 1066–67 (8th Cir. 2011)). Though this amount must be "reasonably certain," *id.* n.2, determining any amount of future expenses is necessarily an imperfect science. Thus, in *Palmer*, for example, the Eighth Circuit affirmed a district court's award of $200,000 in damages after an expert testified that the true cost would likely be about $1,000,000. 643 F.3d at 1068.

There are two sources of information in the record from which the Court could potentially draw to estimate Doe's future medical expenses. The first is the letter from the Trauma and Recovery Specialist in Colorado, which projected over $100,000 in costs per year. (Doc. 59-2, p. 1). The second is the records of medical expenses already incurred by Doe, which the Court can use to project her costs moving forward.

8

*Id.* at 2-6. The Court believes the latter source of information provides a more accurate estimate of future costs. This is so for several reasons. First, the letter provides little information about the author's qualifications. Second, the letter does not reveal what sources the author used to conclude that outpatient care would cost $1,000 per week and inpatient care would cost $2,000 per week. Third, the care that Doe has already received evinces much lower amounts than those $1,000 and $2,000 figures. For example, even if Doe were to received two sessions of counseling per day, seven days a week, at the $40 rate charged by her Fayetteville therapist, the cost would be about half of the letter's $1,000 estimate. And, Doe's inpatient care in Colorado cost $120 per day—or $840 per week.

The Court finds, based in large part on Doe's mother's victim impact statement and her in-court testimony, that Doe will require psychological treatment into the indefinite future. She testified that Doe has trouble sleeping, is prone to outbursts, is not progressing in school, has become socially withdrawn, does not like being filmed, is afraid to sleep with the lights off, and is afraid to shower alone. Given the nature of her abuse, these symptoms will not go away in a short period of time, or perhaps ever. The Court estimates that Doe will incur at least $40,000 in future psychological and related expenses. To be sure, this is an extremely low estimate. Projecting 15 years of outpatient therapy at a modest average of $50 per week, for example, is $39,000 alone. This does not include any inpatient care, medications, or other medical expenses that Doe may require.

The Court will, accordingly, use $40,000 as a barometer for Doe's future medical expenses. This brings her total damages to an estimated $54,895. Again, this

9

constitutes a necessarily understated amount, due to the relative dearth of documentation in this case.

### B. Determining Proximate Causation

The Court must next determine what amount of these damages was proximately caused by Hoskins. *See Paroline*, 134 S. Ct. at 1722 ("Restitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses."). The Court's task here is to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id.* at 1727-28. "This cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id.* at 1728.

The Court finds that a restitution award of $7,500 is appropriate in this case. To be sure, most of Doe's damages were not proximately caused by Hoskins. They were caused by Jason Henry, LaQuentin Jones, and other unknown offenders. But Hoskins' actions proximately caused a significant part of those damages too. Hoskins filmed Doe being raped, and distributed the video to another minor. The rape occurred, moreover, at her apartment while she was (obviously) present. Meanwhile, she knew that Doe was under the age of 18 and the person having sex with her was over the age of 18.

Doe's mother explained that Doe no longer likes being filmed. She explained that she pulled Doe out of school for some time because her classmates knew about the rape, and knew that it had been recorded. When attempting to parse the harm caused by Hoskins from the harm caused by the other offenders, she described the video recording as being like having a memento—a terrible reminder—of the event. She and

Doe will have to live with the constant fear that the video is, or will be, uploaded to the internet, and seen by any number of people. Certainly, then, Hoskins' conduct proximately caused some of Doe's past, present, and future expenses. An award of $7,500 represents less than 15% of the $54,895 in damages estimated by the Court—tracking the Court's finding that most of Doe's damages were caused by non-defendants. It is worth reiterating that the Court does not view these "less than 15%" and "$54,895" figures as exact inputs into a mathematical formula; rather, they are approximated benchmarks that the Court has used in exercising its discretion to fashion a reasonable award of restitution.

### IV.   CONCLUSION

For the reasons stated herein, the Court **ORDERS** that restitution be awarded to Doe in the amount of $7,500. To effectuate this Order, the Probation Office shall promptly prepare a separate restitution order setting forth the terms and conditions of repayment, for the Court's approval.

**IT IS SO ORDERED** on this __16th__ day of August, 2016.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE